An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-507

Filed 6 August 2025

Guilford County, Nos. 18CRS069912-400, 18CRS069913-400

STATE OF NORTH CAROLINA

v.

TORIAN ARNETT FAIR, Defendant.

Appeal by Defendant from judgment entered 28 July 2023 by Judge Stephanie L. Reese in Guilford County Superior Court. Heard in the Court of Appeals 18 March 2025.

> *Attorney General Jeff Jackson, by Assistant Attorney General Ashton H. Roberts, for the State.*

> *Mark Montgomery, for Defendant-Appellant.*

CARPENTER, Judge.

Torian Arnett Fair ("Defendant") appeals from judgment entered after a jury found him guilty of two counts of first-degree statutory sex offense and two counts of taking indecent liberties with a child. On appeal, Defendant argues the trial court

erred by failing to identify the victim, Lila,[1] in its jury instructions. Defendant also asserts an ineffective assistance of counsel ("IAC") claim. After careful review, we discern no prejudicial error and deny Defendant's IAC claim.

## I. Factual & Procedural Background

On 24 July 2023, a Guilford County grand jury indicted Defendant for two counts each of first-degree statutory sex offense and taking indecent liberties with a child. The indictment listed Lila as the victim. On 25 July 2023, Defendant's case proceeded to trial and the evidence tended to show the following.

Lila was born in August 2009 and resided with her mother, father, and two younger siblings. Lila's mother often worked nights and Lila's father would stay home with the children. Defendant was a close friend of Lila's father; Lila and her siblings referred to Defendant as "Uncle Tory." From 2015 to 2017, Defendant frequently visited Lila's family home to drink alcohol with Lila's father while Lila's mother was at work. When Defendant had too much to drink, he would stay overnight.

In October 2017, when Lila was eight years old, Lila's mother returned home from work at approximately 4:00 a.m. When she walked into the house, Lila's mother saw Defendant sitting on the couch with a blanket covering his body. Lila was also in the living room, and there were snacks and candy on the coffee table. Lila's mother

---

[1] A pseudonym is used to protect the identity of the minor child and for ease of reading. *See* N.C. R. App. P. 42(b).

thought this was odd, given the time of day and the fact that she always kept snacks and candy out of Lila's reach. Lila's mother asked Defendant why Lila was awake at 4:00 a.m., but Defendant did not respond and "pretended to be asleep." When Lila's mother asked Lila where she got the snacks, Lila said Defendant gave them to her. Lila's mother immediately woke up Lila's father. Together, they confronted Defendant and asked him to leave. Defendant left, and Lila's mother and father "discussed [Defendant] not coming back to the house." Over Lila's mother's objections, Defendant eventually returned to the house.

One morning in late December 2017, Lila's parents overheard a conversation between Lila and her sister. Lila's sister stated, "[y]ou know, Uncle Tory is nasty[,]" and Lila responded, "[s]hh, shh, shh, no, we're not supposed to talk about Uncle Tory." Lila's parents proceeded to speak with the children separately. Lila told her mother that Defendant was "kissing her in her mouth and licking her on her private parts." Thereafter, Lila's parents called Defendant, requesting that he come over to discuss the children's accusations. Defendant briefly responded, "I couldn't have been drunk could I have?" then hung up the phone. Lila's parents tried to call Defendant again, but they were unable to reach him. The next day, Lila's parents contacted the police.

Lila spoke to Officer R.T. Brooks with the Greensboro Police Department. Lila informed Officer Brooks that "Uncle Tory licked her private parts and kissed [her] on [her] lips." Lila also told Officer Brooks that Defendant would perform these acts in their home while her father was asleep and her mother was at work. On 16 February

2018, Lila visited the Greensboro Children's Advocacy Center for an interview with Brenna Farley, a child forensic interview specialist. During the interview, Lila disclosed that Defendant kissed her and her sister's "private parts." The interview was recorded and published to the jury as State's Exhibit 1.

Dr. Jason Jones, Lila's psychiatrist, referred Lila to Lisa Pleasants, a licensed clinical social worker, for an assessment and therapy. Lila met with Pleasants on 24 January 2018 and continued to see her once a week. Some weeks, however, Lila would meet with Pleasants two or three times. Lila's parents informed Pleasants that Lila had been pulling off her own fingernails, chewing furniture, and cutting her hair. In response, Pleasants remarked it is common for children who are sexually abused to engage in this type of behavior to make themselves "less attractive." When speaking to Pleasants, Lila also disclosed her recurring nightmare of "Uncle Tory breaking in the house, killing her family, [and] killing her." During an at-home visit with Pleasants, Lila pointed to her bed and stated, "[t]his is where Uncle Tory licked my vagina." Lila further reported that Defendant asked her to "lick his penis and put it in her mouth."

Lila told Pleasants that Defendant forced her to drink alcohol on more than one occasion and smoke out of a device that had a "round clear ball" and a "long stem." Based on Lila's description, Pleasants believed that Defendant forced Lila to smoke a "crack pipe." Pleasants held sessions with Lila for approximately four years and reported that Lila's behaviors were consistent with someone who experienced sexual

trauma. Pleasants testified that Lila was "very specific" when discussing the sexual abuse.

Lila, who was thirteen years old at the time of trial, testified that Defendant would enter her bedroom and wake her up while her father was asleep. Defendant would "pull [her] panties down, and put his mouth on [her] private part." Lila also testified that on one occasion she saw Defendant "doing it to [her] sister." Defendant would give Lila snacks and candy afterward. Lila explained that she never told her parents what happened because she did not want her father to get angry.

The trial court instructed the jury that Defendant was on trial for two counts of first-degree statutory sex offense and two counts of taking indecent liberties with a child. The trial court did not specifically instruct the jury that Lila was the sole victim alleged in the indictment. The jury found Defendant guilty as charged and the trial court sentenced Defendant to 220 months minimum and 243 months maximum in the Department of Adult Corrections, with two days of credit for time served. Defendant gave oral notice of appeal in open court.

## II. Jurisdiction

This Court has jurisdiction under N.C. Gen. Stat. §§ 7A-27(b)(1) and 15A-1444(a) (2023).

## III. Issues

The issues are whether: (1) the trial court erred by failing to specify that Lila was the exclusive victim when instructing the jury; and (2) Defendant received IAC.

## IV. Analysis

### A. Jury Instructions

First, Defendant asserts he was denied his right to a unanimous jury verdict because the trial court failed to name Lila as the exclusive victim in the jury instructions. Defendant further contends the jury convicted him on a theory not presented in the indictment.

#### 1. Preservation

As an initial matter, we address whether this issue is properly preserved for our review. To preserve an issue for appellate review, "the appellant must have raised that specific issue before the trial court to allow it to make a ruling on that issue." *Regions Bank v. Baxley Com. Props., LLC*, 206 N.C. App. 293, 298–99, 697 S.E.2d 417, 421 (2010) (citing N.C. R. App. P. 10(b)(1)). In a criminal case, however, we may "review unpreserved issues for plain error when they involve either (1) errors in the judge's instructions to the jury, or (2) rulings on the admissibility of evidence." *State v. Gregory*, 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996) (citations omitted).

But the appellant must "specifically and distinctly" contend the error amounted to plain error. *State v. Frye*, 341 N.C. 470, 496, 461 S.E.2d 664, 677 (1995) (citing N.C. R. App. P. 10(c)(4)). Merely reciting "plain error" as an alternative argument is insufficient, *see State v. Grooms*, 353 N.C. 50, 66, 540 S.E.2d 713, 723 (2000), as an "empty assertion of plain error, without supporting argument or analysis of prejudicial impact, does not meet the spirit or intent of the plain error

rule," *State v. Cummings*, 352 N.C. 600, 637, 536 S.E.2d 36, 61 (2000); *see also State v. Reber*, 386 N.C. 153, 159–60, 900 S.E.2d 781, 787–88 (2024) (explaining a defendant must demonstrate that absent the error in question, the jury "almost certainly" would have reached a different result to satisfy the "prejudice prong" of the plain-error test).

Here, defense counsel did not object to the trial court's instructions. Accordingly, this issue is unpreserved. *See* N.C. R. App. P. 10(b)(1). Although Defendant contends the trial court's instructions constituted plain error, he provides no supporting argument for his assertion. Instead, he simply states: "It is probable that at least one jury (sic) based his or her verdicts on one act against Lila and one act against the sister, while another juror based his or her verdicts on two acts against Lila." Because Defendant did not analyze the prejudicial impact of the alleged error, he waived plain-error review. *See Cummings*, 352 N.C. at 636–37, 563 S.E.2d at 61 (explaining "[t]he right and requirement to specifically and distinctly contend an error amounts to plain error does not obviate the requirement[s]" of Rule 28 which provide that a party must include arguments supporting their contention); N.C. R. App. P. 28(a), (b)(6).

Nevertheless, Defendant's failure to object to the trial court's instructions does not wholly preclude appellate review, as the issue of unanimity of verdict may be considered for the first time on appeal. *See State v. Ashe*, 314 N.C. 28, 39, 331 S.E.2d 652, 659 (1985) ("Where, however, the error violates [a] defendant's right to a trial by

a jury of twelve, defendant's failure to object is not fatal to his right to raise the question on appeal.") (citations omitted).

**2. Discussion**

Defendant argues he was denied his right to a unanimous jury verdict because "it is likely that one or more jurors voted to convict [him] on acts allegedly committed against Lila's sister, while others convicted him of crimes against Lila." According to Defendant, because the jury heard evidence concerning alleged abuse of Lila's sister and no victim was specified in the instructions, the jury was encouraged to believe there were two victims in this case: Lila and her sister. We disagree.

"We review issues concerning the unanimity of a jury verdict de novo, examining 'the verdict, the charge, the jury instructions, and the evidence to determine whether any ambiguity as to unanimity has been removed.'" *State v. Juran*, 294 N.C. App. 81, 89, 910 S.E.2d 872, 879 (2024) (quoting *State v. Petty*, 132 N.C. App. 453, 461–62, 512 S.E.2d 428, 434 (1999)). Under a de novo review, this Court "'considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632–33, 669 S.E.2d 290, 294 (2008) (quoting *In re Greens of Pine Glen Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)).

"The North Carolina Constitution and North Carolina Statutes require a unanimous jury verdict in a criminal jury trial." *State v. Lawrence*, 360 N.C. 368, 373–74, 627 S.E.2d 609, 612 (2006) (citations omitted); *see* N.C. Const. art. I, § 24;

N.C. Gen. Stat. § 15A-1237(b) (2023); *State v. Johnson*, 253 N.C. App. 337, 341, 801 S.E.2d 123, 126 (2017). A defendant's right to a unanimous jury verdict is compromised if the trial court's instructions were "fatally ambiguous." *State v. Haddock*, 191 N.C. App. 474, 480, 664 S.E.2d 339, 344 (2008) (citations omitted). A " 'disjunctive instruction, which allows the jury to find a defendant guilty if he commits either of two underlying acts, *either of which is in itself a separate offense*, is fatally ambiguous because it is impossible to determine whether the jury unanimously found that the defendant committed one particular offense.' " *State v. Bowman*, ___ N.C. ___, ___, 915 S.E.2d 134, 141 (2025) (quoting *State v. Lyons*, 330 N.C. 298, 302, 412 S.E.2d 308, 308 (1991)) (emphasis in original). On the other hand, where " 'the trial court merely instructs the jury disjunctively as to various alternative acts *which will establish an element of the offense*, the requirement of unanimity is satisfied.' " *Id.* at ___, 915 S.E.2d at 141 (quoting *Lyons*, 330 N.C. at 303, 412 S.E.2d at 308) (emphasis in original).

When reviewing the indictment and the evidence, we assess whether "it is possible to match a jury's verdict of guilty with a specific incident." *State v. Bates*, 179 N.C. App. 628, 633, 634 S.E.2d 919, 922 (2006). As to the jury instructions, we review whether the instructions "adequately ensured that the jury would match its unanimous verdicts with the charges against the defendant." *Id.* at 634, 634 S.E.2d at 922. Finally, regarding the verdict sheets, we consider whether they "could be properly understood by the jury based on the evidence presented at trial." *Bates*, 179

N.C. App. at 634, 634 S.E.2d at 922; *see also State v. Wiggins*, 161 N.C. App. 583, 593, 589 S.E.2d 402, 409 (2003) ("[V]erdict sheets do not need to match the specificity of indictments.") (citation omitted). Ultimately, "[t]here is no unanimity problem if it is possible to match a jury's verdict of guilty with a specific incident after reviewing the evidence, indictment, jury charge, and verdict sheets." *Bates*, 179 N.C. App. at 633, 634 S.E.2d at 922 (citations omitted).

Here, Defendant was indicted for two counts of first-degree statutory sex offense and two counts of taking indecent liberties with a child. The indictments specifically named Lila as the victim. A defendant commits a first-degree statutory sexual offense if they "engage[] in a sexual act with a victim who is a child under the age of 13 years and the defendant is at least 12 years old and is at least four years older than the victim." N.C. Gen. Stat. § 14-27.29(a) (2023). Within the meaning of section 14-27.29(a), a "sexual act" means "[c]unnilingus, fellatio, analingus, or anal intercourse, but does not include vaginal intercourse. Sexual act also means penetration, however slight, by any object into the genital or anal opening of another person's body." N.C. Gen. Stat. § 14-27.20(4) (2023). A defendant commits indecent liberties by "[w]illfully commit[ting] or attempt[ting] to commit any lewd or lascivious act upon or with the body or any part or member of the body of any child of either sex under the age of 16 years." N.C. Gen. Stat. § 14-202.1(a)(2) (2023).

During her testimony, Lila briefly referenced a sexual act Defendant allegedly performed on her sister. After Lila explained that Defendant would "come into [her]

room, pull [her] panties down, and put his mouth on [her] private part," she stated, "one night, I saw [Defendant] doing it to my sister." Lila also mentioned her sister when testifying about the conversation they had about Defendant which Lila's parents overheard. Finally, in Lila's interview with Farley, Lila disclosed that Defendant kissed her and her sister's "private parts."

Lila's sister did not testify at Defendant's trial. During Lila's testimony, she spoke about the sexual acts Defendant performed on her and discussed her experiences in the aftermath of Defendant's abuse. Additionally, Lila's mother and father both testified extensively about Defendant's abuse of Lila, her mental health conditions, and the changes in Lila's behavior following Defendant's abuse. Specifically, Lila's mother testified regarding Lila's experiences with bullying, her transition to a new school, her suicide attempt in 2019, and her homicidal ideations. Lila's mother also testified about Lila's medications, therapy, and nightmares. Lila's parents mentioned Lila's sister, but their remarks concerning Lila's sister were brief and primarily limited to Lila's sister's unwillingness to discuss the abuse with anyone. The jury heard substantial testimony from Pleasants regarding her sessions with Lila, reinforcing that Lila was the only victim in this case. Despite the passing remarks regarding Defendant's alleged sexual abuse of Lila's sister, the overwhelming majority of the evidence focused exclusively on Lila.

Moreover, certain lines of questioning at Defendant's trial revealed that Lila, not her sister, was the victim. For example, during Lila's testimony, the State

instructed her not to discuss any of her sister's prior statements concerning Defendant. Similarly, during Lila's mother's testimony, the State informed Lila's mother that "we're not going to talk about what [Lila's sister] had to say." Furthermore, Farley explained that Lila's sister did not undergo a forensic interview, and several witnesses, including Lila's mother and father, discussed Lila's sister's unwillingness to discuss the abuse or participate in any interviews. Thus, based on the indictments and the evidence at trial, we conclude it is possible to match the jury's verdict with specific incidents of abuse against Lila. *See Bates*, 179 N.C. App. at 633, 634 S.E.2d at 922.

We next consider the jury instructions within the context of Defendant's unanimity argument. The trial court instructed the jury separately for the two counts of first-degree statutory sexual offense and two counts of indecent liberties with a child. The trial court did not explicitly state that Lila was the victim for each charge. Nevertheless, the trial court instructed the jury that they must be unanimous. Indeed, after explaining the charges to the jury, the trial court stated: "All twelve of you must agree to the verdict. You cannot reach a verdict by a majority vote. When you've agreed upon a unanimous verdict as to each charge, your foreperson should so indicate on the verdict form." Thereafter, the trial court informed the jury it should only record its verdicts and notify the bailiff after "unanimously agree[ing] upon a verdict as to each charge . . . ." After reaching a verdict, the trial court polled the jury as to each charge, asking "if you all agree to and assent to that verdict, would you all

raise your hands." All twelve jurors raised their hands. Even though Lila was not identified as the victim in the jury instructions, Defendant's right to a unanimous jury verdict was not violated because the trial court "adequately ensured" that the jury understood it was required to reach a unanimous verdict on each charge. *See Bates*, 179 N.C. App. at 633–34, 634 S.E.2d at 922.

Lastly, the trial court submitted four verdict sheets to the jury. Each verdict sheet included the charge and the case number. Based on the indictments and the evidence presented at trial, there is no indication that the jury misunderstood the verdict sheets, nor does Defendant argue as much. Although the trial court did not specifically name Lila as the victim in the jury instructions, our examination of the indictment and evidence, jury instructions, and verdict sheets, reveal Defendant's right to a unanimous jury verdict was not violated. *See id.* at 634, 634 S.E.2d at 922.

In sum, the preferred practice is for the trial court to specify the victim in its instructions to the jury, but "like everyone else, judges make mistakes." *State v. King*, 386 N.C. 601, 608, 906 S.E.2d 808, 814 (2024). Although the trial court's instructions were not perfect, Defendant was "not entitled to receive [a] 'perfect' trial[]; instead, [he was] entitled to receive 'a fair trial, free of prejudicial error.'" *State v. Malachi*, 371 N.C. 719, 733, 821 S.E.2d 407, 418 (2018) (quoting *State v. Ligon*, 332 N.C. 224, 243, 420 S.E.2d 136, 147 (1992)). The trial court did not prejudicially err by failing to name Lila as the victim. Therefore, Defendant received a fair trial, free of prejudicial error. *See id.* at 733, 821 S.E.2d at 418.

**B. IAC**

Next, Defendant argues he received IAC because his defense counsel failed to request a limiting instruction and object to the jury instructions. We disagree.

Whether a defendant received IAC is a question of law that this Court reviews de novo. *State v. Wilson*, 236 N.C. App. 472, 475, 762 S.E.2d 894, 896 (2014) (citing *State v. Martin*, 64 N.C. App. 180, 181, 306 S.E.2d 851, 852 (1983)). Under a de novo review, this Court "'considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *Williams*, 362 N.C. at 632–33, 669 S.E.2d at 294 (quoting *In re Greens of Pine Glen Ltd. P'ship*, 356 N.C. at 647, 576 S.E.2d at 319).

To establish IAC, a defendant must satisfy a two-part test. *State v. Braswell*, 312 N.C. 553, 562, 324 S.E.2d 241, 248 (1985) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 674, 693 (1984)). First, a defendant must demonstrate his trial counsel's performance fell "below an objective standard of reasonableness" by showing his performance was "deficient." *Braswell*, 312 N.C. at 561–62, 324 S.E.2d at 248–49. Next, the defendant must demonstrate his trial counsel's error prejudiced him by showing a reasonable probability of a different outcome but for the error. *State v. Lynn*, 290 N.C. App. 532, 537, 892 S.E.2d 883, 887 (2023). "The probability of a different result at trial is 'reasonable' if the error undercuts confidence in the result." *Id.* at 537, 892 S.E.2d at 887 (quoting *State v. Allen*, 360 N.C. 297, 316, 626 S.E.2d 271, 286 (2006)).

There is a "strong presumption" that a defendant's trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695. If we "can determine at the outset that there is no reasonable probability that in the absence of counsel's alleged errors the result of the proceeding would have been different" then it is not necessary for us to decide whether a defense counsel's alleged errors were actually deficient. *Braswell*, 312 N.C. at 563, 324 S.E.2d at 249.

Defendant has not developed his IAC claim beyond a two-sentence paragraph in which he states: "There could have been no reasonable strategy in failing to object to the instruction" and "there is more than a reasonable likelihood that [ ] [D]efendant was prejudiced by this mistake." Defendant offers no supporting argument for his assertion and does not elaborate on how his defense counsel's alleged failures resulted in IAC. Nevertheless, we conclude Defendant did not receive IAC.

Indeed, the State's witnesses provided a consistent account of Defendant's sexual abuse of Lila. Lila's parents testified about their relationship with Defendant and their daughters' conversation concerning Defendant that they overheard. Farley, Pleasants, and Officer Brooks all testified that Lila consistently reported that Defendant sexually abused her. Lila described the sexual acts Defendant performed on her with specificity. In contrast, the testimony concerning Lila's sister was inconsequential. Despite the passing comments concerning Lila's sister, the evidence left no doubt that Lila was the victim in this case.

Thus, even assuming defense counsel requested a limiting instruction regarding the alleged abuse of Lila's sister or objected to the jury instructions, we cannot conclude that there is a reasonable probability that the outcome of Defendant's trial would have been different. *See Braswell*, 312 N.C. at 563, 324 S.E.2d at 249. The jury heard ample evidence of Defendant's sexual abuse of Lila and we are not convinced that the jury would have returned a different verdict had defense counsel requested a limiting instruction or objected to the instructions. Because Defendant failed to demonstrate prejudice, he cannot establish IAC. Accordingly, we deny Defendant's IAC claim.

## V. Conclusion

The trial court did not prejudicially err by failing to name Lila as the victim in its jury instructions. Further, the cold record reveals Defendant did not receive IAC.

NO PREJUDICIAL ERROR.

Chief Judge DILLON and Judge GRIFFIN concur.

Report per Rule 30(e).