ZACHARY, Judge.
 

 *568
 
 Defendant Timothy Levon Wilson appeals from judgments entered upon jury verdicts finding him guilty of taking indecent liberties with a child, assault by strangulation, disseminating obscene material to a minor under 13 years of age, and first-degree statutory rape of a child under 13 years of age. Defendant argues that (1) the trial court erred in failing to dismiss the charge of disseminating obscene material to a minor due to insufficient evidence; (2) the trial court's jury instructions violated Defendant's constitutional right to a unanimous jury verdict; and (3) the trial court violated Defendant's state and federal constitutional rights when it denied his request to reopen the case upon changing his mind that he wished to testify. We conclude that there was no error.
 

 Background
 

 On 30 March 2015, Defendant was indicted for five counts of taking indecent liberties with a child, four counts of sex offense in a parental role, four counts of first-degree statutory rape of a child under 13, one count of disseminating obscenity to a minor under 13, and one count of assault by strangulation. Defendant was indicted for six additional counts of taking indecent liberties with a child on 1 June 2015.
 

 *569
 
 Six of Defendant's charges for taking indecent liberties with a child involved Defendant's older stepdaughter, Q.R.,
 
 [1]
 
 who was born in August of 1998. However, Defendant's arguments on appeal only concern Defendant's conduct against his younger stepdaughter, Q.B.
 

 The evidence at trial showed that Defendant engaged in a pattern of sexual conduct with Q.B., who was born in May 2003. She was the youngest child in the home and was the first to arrive home from school each day.
 

 *895
 
 Q.B. would thereafter remain alone with Defendant until Q.R. and Defendant's son returned home from school, with Q.B.'s mother returning home much later. Most of the incidents for which Defendant was charged occurred during the weekdays when Q.B. was alone in the house with Defendant. Each of the acts was alleged to have occurred between 15 May 2011 and 1 January 2015.
 

 Q.B. testified that Defendant had touched her on her vagina "[m]ore than one time," but she was best able to remember the details of two particular incidents. During the first, Q.B. was in the master bedroom and Defendant had her sit "[o]n the edge of his bed" and "touched [her] vagina with his hands." Q.B. said that "[she] was scared, [and she] didn't know what to do." Q.B. also testified about an incident that occurred while she was in her bedroom. She was lying on the bottom bunk of her bed when Defendant came into her room wearing only his boxers, lay down next to her, and began inserting his fingers into her vagina.
 

 Q.B.'s testimony also revealed that Defendant had penetrated her vagina with his penis on multiple occasions. Several of those incidents occurred in the master bedroom. Q.B. recalled that on one occasion, she was alone in the house with Defendant after school. Defendant was naked, told Q.B. to take her clothes off, put Q.B. on his bed, and retrieved the "Blue Magic" hair grease from the bathroom. Defendant then "put [the] grease on his penis and he just- ... he stuck it inside my vagina." Q.B. said that Defendant "stuck it in and out" "[m]ore than one time," until "he heard something" and stopped. Q.B. also testified in detail about a second incident that took place in the master bedroom, during which Defendant inserted his penis into Q.B.'s vagina after applying a different type of grease from a pink strawberry container. On another occasion, Q.B. said that one morning before school, Defendant "told me like go take a shower and it was like after. And then like I didn't have no clothes on because I went to go take a shower and then he just told me to go in his room and that's when he just stuck his penis in my vagina."
 

 *570
 
 Q.B. said that Defendant eventually stopped "[b]ecause my sister called my name."
 

 Additionally, Q.B. testified that Defendant had penetrated her vagina with his penis "[m]ore than one time" in the "kids' living room" of the house. On one of the occasions, she was lying on the floor watching television when Defendant "told [Q.B.] to take off [her] clothes and then he only had his boxers on." After Q.B. took her clothes off, Defendant "told [her] to lay back down and then he stuck his penis in [her] vagina." Defendant eventually got off of her because "[h]e was hearing noises."
 

 Similar incidents occurred "[m]ore than one time" in the "adult living room." On one of those occasions, Q.B. said that she was sitting on the couch and that Defendant came into the room in his boxers, "told [her] to take off [her] clothes[,]" put hair grease on his penis, got "[o]n top of [her,]" and put his penis "[i]n and out" of her vagina while still wearing his boxers. Q.B. said that she "was scared," and that "[i]t hurt." Q.B. testified about yet another particular incident of vaginal intercourse that took place in Defendant's son's bedroom.
 

 Lastly, Q.B. testified about an incident wherein Defendant was watching a nude sex scene in his bedroom and called her into the room to watch. Defendant was charged with disseminating obscenity to a minor under 13 years of age for that incident. Defendant moved to dismiss this charge due to insufficiency of the evidence, which the trial court denied.
 

 Defendant's indictments only alleged the general conduct underlying each charge. However, the jury verdict sheets indicated that Defendant's four counts each of sex offense in a parental role and first-degree statutory rape, along with four of his charges for taking indecent liberties, were based upon Defendant's alleged conduct of "engaging in vaginal intercourse" with Q.B. in four distinct locations: (1) "in the Defendant's bedroom"; (2) "in the 'kids' living room' "; (3) "in the 'adult's living room' "; and (4) "in [Defendant's son's] bedroom," respectively. The verdict sheets indicated that Defendant's fifth count of taking indecent liberties was for "touching [Q.B.'s] genitals with his
 
 *896
 
 hands." Six additional counts of taking indecent liberties were for conduct involving Q.R., two of which the State voluntarily dismissed.
 

 Defendant presented no evidence at trial, and the jury found Defendant guilty of all nineteen charges. The trial court arrested judgment on the four counts of sex offense in a parental role and four counts of taking indecent liberties with a child because they involved the same underlying conduct as the four counts of first-degree statutory
 
 *571
 
 rape, for which the jury had also found Defendant guilty. The trial court imposed consecutive sentences against Defendant, in all totaling 1,510 to 2,070 months' imprisonment. Defendant gave oral notice of appeal in open court.
 

 Motion to Dismiss
 

 Defendant first argues that the trial court erred in denying his motion to dismiss the charge of disseminating obscene material to a minor under 13 years of age because the State's evidence was insufficient to warrant the submission of that charge to the jury. In particular, Defendant contends that the State presented insufficient evidence to show that the material was "obscene material" within the meaning of the statute.
 

 The standard of review upon a defendant's motion to dismiss is well established:
 

 When reviewing a defendant's motion to dismiss a charge on the basis of insufficiency of the evidence, this Court determines whether the State presented substantial evidence in support of each element of the charged offense. Substantial evidence is relevant evidence that a reasonable person might accept as adequate, or would consider necessary to support a particular conclusion. In this determination, all evidence is considered in the light most favorable to the State, and the State receives the benefit of every reasonable inference supported by that evidence. ... Additionally, a substantial evidence inquiry examines the sufficiency of the evidence presented
 
 but not its weight
 
 , which is a matter for the jury.
 

 State v. Hunt
 
 ,
 
 365 N.C. 432
 
 , 436,
 
 722 S.E.2d 484
 
 , 488 (2012). When a defendant's motion to dismiss challenges "the sufficiency of circumstantial evidence, the question for the court is whether a reasonable inference of [the] defendant's guilt may be drawn from the circumstances."
 
 State v. Rowland
 
 ,
 
 263 N.C. 353
 
 , 358,
 
 139 S.E.2d 661
 
 , 665 (1965). If so, then the defendant's motion to dismiss must be denied in order "for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty."
 

 Id.
 

 In order to survive a motion to dismiss a charge of disseminating obscene material to a minor under
 
 N.C. Gen. Stat. § 14-190.8
 
 , the State must present substantial evidence to show (1) that the defendant is 18 years of age or older, and (2) that the defendant knowingly,
 
 *572
 
 (3) disseminated, (4) to a minor under the age of 13, (5) any material which the defendant knew or reasonably should have known to be obscene within the meaning of section 14-190.1.
 
 N.C. Gen. Stat. § 14-190.8
 
 (2017) ;
 
 State v. Hill
 
 ,
 
 179 N.C. App. 1
 
 , 14,
 
 632 S.E.2d 777
 
 , 785 (2006).
 

 Pursuant to
 
 N.C. Gen. Stat. § 14-190.1
 
 , material is considered to be "obscene" if:
 

 (1) The material depicts or describes in a patently offensive way sexual conduct specifically defined by subsection (c) of this section [as,
 
 inter alia
 
 , vaginal, anal, or oral intercourse, whether actual or simulated, normal or perverted]; and
 

 (2) The average person applying contemporary community standards relating to the depiction or description of sexual matters would find that the material taken as a whole appeals to the prurient interest in sex; and
 

 (3) The material lacks serious literary, artistic, political, or scientific value; and
 

 (4) The material as used is not protected or privileged under the Constitution of the United States or the Constitution of North Carolina.
 

 N.C. Gen. Stat. § 14-190.1
 
 (b) (2017) ;
 
 see also
 

 id.
 

 § 14-190.1(c)(1). Whether particular content is obscene is to "be judged with reference to ordinary adults."
 

 Id.
 

 § 14-190.1(d). Moreover, "[n]othing in section 14-190.1 requires the State to produce the precise material
 
 *897
 
 alleged to be obscene."
 
 State v. Mueller
 
 ,
 
 184 N.C. App. 553
 
 , 566,
 
 647 S.E.2d 440
 
 , 450,
 
 cert. denied
 
 ,
 
 362 N.C. 91
 
 ,
 
 657 S.E.2d 24
 
 (2007).
 

 In the instant case, Defendant's argument is premised primarily upon the fact that "contemporary community standards must take into account the fact that television regularly depicts couples having sex." Because "Q.B.'s description of what she saw[ ] also describes what can be seen on contemporary television"-particularly on premium cable channels such as Showtime, HBO, and FX that regularly depict "sexual activity and nudity"-Defendant argues that "the State failed to provide substantial evidence that what [Q.B.] saw was obscene according to contemporary standards." Defendant therefore argues that the trial court erred in denying his motion to dismiss the charge of disseminating obscenity to a minor. We disagree.
 

 *573
 
 Q.B. testified to the following circumstances regarding the alleged incident:
 

 Q. [W]as there ever a time when the Defendant showed you any movies that you didn't like?
 

 A. Yes.
 

 Q. Okay. Can you tell me about that, please?
 

 A. It was like he had helped me with my math homework and he like had TV in his room and like it was already set up and-
 

 Q. [Q.B.], let's just wait a minute for that to go back, okay. Okay. So you said there was a TV in [Defendant's] room and it was already set up?
 

 A. Yes.
 

 Q. And so tell me what happened from there.
 

 A. He had told me to go in his room and then I saw on the TV a guy and a girl.
 

 Q. And you saw on the TV a guy and a girl. Before we talk about that, you said that [Defendant] told you to go in his room?
 

 A. Yes.
 

 Q. So you didn't just wander in there?
 

 A. No.
 

 ....
 

 Q. What were the guy and the girl on the TV doing?
 

 A. They were having sex.
 

 ....
 

 Q. And when you say they were having sex, can you describe what you saw?
 

 A. The guy was on top of the girl and he just stuck his penis inside of her.
 

 Q. And did the guy and the girl on TV, did they have clothes on at all?
 

 *574
 
 A. No.
 

 Q. And when you went in [Defendant's] room and saw that, did [Defendant] go in the room with you?
 

 A. Yes.
 

 Q. Did [Defendant] say anything to you?
 

 A. No.
 

 Q. And did you watch the TV?
 

 A. Yes.
 

 Q. Okay. How long did you watch the TV?
 

 A. Like for a little bit.
 

 ....
 

 Q. And when you-did you eventually leave the room?
 

 A. Yes.
 

 Q. And how did you leave the room?
 

 A. Just walked out.
 

 ....
 

 Q. Okay. And how did watching that movie make you feel?
 

 A. Scared and disgusted.
 

 ....
 

 Q. Why were you scared?
 

 A. Because I never seen anything like it.
 

 On cross-examination, Q.B. clarified that Defendant was already in the master bedroom with the scene playing when he called Q.B. into the room.
 

 In addition to Q.B.'s description of the movie that Defendant had shown her, the State introduced a photograph of three pornographic DVDs that detectives found during their search of the master bedroom. Q.B.'s mother also testified that Defendant "had so many" pornographic DVDs that he kept in that room. According to Q.B.'s mother, however, when Q.B. approached authorities with her allegations concerning Defendant, Defendant
 
 *898
 
 "packed [his pornography collection] up and
 
 *575
 
 got rid of it and he called his older children and sent some of it away." She said that Defendant had also taken a container full of his remaining pornography collection "out to the shed" behind their property. Q.B.'s mother later found that collection and gave it to detectives. At trial, various titles from Defendant's collection were read to the jury.
 

 When viewed in the light most favorable to the State, we conclude that this evidence would allow a jury to reasonably infer that the material Defendant showed to Q.B. was of the same nature of that contained in Defendant's pornography collection and was, therefore, "obscene" material under contemporary community standards, the dissemination of which to children under the age of 13 is unlawful. Accordingly, the trial court properly denied Defendant's motion to dismiss the charge of disseminating obscene material to a minor, as the State presented substantial evidence of each element of that offense.
 

 Unanimous Jury Verdict
 

 Next, Defendant argues that the trial court's jury instructions denied him of his constitutional right to a unanimous jury verdict. We disagree.
 

 The trial court instructed the jury that Defendant was charged,
 
 inter alia
 
 , with nine counts of taking indecent liberties with a child,
 
 [2]
 
 four counts of first-degree rape of a child, and four counts of sex offense in a parental role. The trial court provided a single instruction for each offense, without describing the details of the conduct underlying each individual charge. The trial court did, however, instruct the jury that "[y]ou must consider each count individually," and the verdict sheets identified each count by victim and included a brief description of the particular conduct alleged by reference to the location in which it occurred. In addition, the trial court instructed the jury that "[a]ll 12 of you must agree upon your verdict. You cannot reach a verdict by majority vote." The trial court also instructed the jury to indicate on the verdict forms "when you have agreed upon unanimous verdicts as to each charge."
 

 Defendant, however, argues that because the charges were "numerous, complex and for some charges based on the same evidence, the trial court's minimalist jury instruction in which the court failed to instruct the jury that they must be unanimous on each charge violated [his] constitutional right to unanimous jury verdicts." Defendant contends that "because the record does not establish that the jury verdicts ... were
 
 *576
 
 unanimous," his convictions for taking indecent liberties with a child and first-degree statutory rape of a child must be vacated.
 
 [3]
 

 Article I, section 24 of the North Carolina Constitution requires that "[n]o person shall be convicted of any crime but by the unanimous verdict of a jury in open court." N.C. Const. art. 1, § 24. In
 
 State v. Lawrence
 
 ,
 
 360 N.C. 368
 
 ,
 
 627 S.E.2d 609
 
 (2006), our Supreme Court enumerated several factors relevant to the determination of whether a defendant has been deprived of his right to a unanimous jury verdict by virtue of the trial court's jury instructions, including:
 

 (1) whether [the] defendant raised an objection at trial regarding unanimity; (2) whether the jury was instructed on all issues, including unanimity; (3) whether separate verdict sheets were submitted to the jury for each charge; (4) the length of time the jury deliberated and reached a decision on all counts submitted to it; (5) whether the record reflected any confusion or questions as to jurors' duty in the trial; and (6) whether, if polled, each juror individually affirmed that he or she had found [the] defendant guilty in each individual case file number.
 

 State v. Pettis
 
 ,
 
 186 N.C. App. 116
 
 , 123,
 
 651 S.E.2d 231
 
 , 235 (2007) (citing
 
 Lawrence
 
 ,
 
 360 N.C. at 376
 
 ,
 
 627 S.E.2d at
 
 613 ),
 
 disc. review
 

 *899
 

 denied
 
 ,
 
 362 N.C. 369
 
 ,
 
 662 S.E.2d 387
 
 ,
 
 cert. denied
 
 ,
 
 555 U.S. 975
 
 ,
 
 129 S.Ct. 470
 
 ,
 
 172 L.Ed.2d 337
 
 (2008).
 

 In the instant case, Defendant did not raise an objection at trial regarding the jury instructions and factor one, the unanimity of the verdicts. As for the third
 
 Lawrence
 
 factor, the jury was provided with separate verdict sheets for each charge, and the sheets included specific details outlining the particular conduct upon which each individual count was based.
 
 Cf.
 

 Lawrence
 
 ,
 
 360 N.C. at 369
 
 ,
 
 627 S.E.2d at 609
 
 ("[N]either the indictments, jury instructions, nor verdict sheets identified the specific incidents of the respective statutory rape and indecent liberties charges for which the jury found [the] defendant guilty."). Lastly, the record does not reflect any confusion or question regarding the jurors' duty in the trial (factor five).
 

 *577
 
 Nevertheless, Defendant contends that "factors two, four and six support a finding that the jury's verdict was not unanimous." However, the case at bar is no different from the facts underlying these factors in
 
 Lawrence
 
 and
 
 Pettis
 
 , upon which Defendant relies.
 

 Regarding the second
 
 Lawrence
 
 factor, Defendant maintains that "the court's only instruction on unanimity came at the end of the charge: 'All 12 of you must agree upon your verdict.' " Defendant argues that "this generic unanimity instruction was not sufficient to assure that each of the nineteen verdicts was unanimous" given the "complexity of the charges." "At a minimum," Defendant maintains that "the instruction should have been: 'All 12 of you must agree upon each of your
 
 verdicts
 
 .' " (Emphasis added). However, Defendant cites no authority for his proposition that the trial court's manner of instructing the jury was insufficient. Moreover, Defendant ignores the trial court's instructions that the jurors "must consider each count individually" and notify the court when they had "agreed upon unanimous verdicts
 
 as to each charge
 
 ." (Emphasis added). Thus, the jury was indeed instructed on unanimity, and the second
 
 Lawrence
 
 factor was satisfied.
 

 Concerning the fourth
 
 Lawrence
 
 factor, Defendant asserts that because the jury's deliberation in the instant case lasted for only thirty-one minutes, this indicates "that the verdicts may not have been unanimous." Defendant's argument directly contradicts the significance that our Supreme Court ascribed to this factor in
 
 Lawrence
 
 , wherein "the jury deliberated and reached a decision on all counts submitted to it in less than one and one-half hours."
 
 Lawrence
 
 ,
 
 360 N.C. at 376
 
 ,
 
 627 S.E.2d at 613
 
 . Just as in
 
 Lawrence
 
 , Defendant presented no evidence for the jury's consideration to contradict the victims' accounts. The fourth factor likewise tends to suggest that the jury's verdicts were unanimous.
 

 Lastly, as to factor six, Defendant asserts that because "the jurors were not polled" in the instant case, "an opportunity to ascertain whether each verdict was unanimous was missed." However, Defendant's argument misrepresents the events. The jurors were in fact polled. After the jury rendered its verdicts, the trial court inquired: "I would like to ask, is that still-are those still your unanimous verdicts? If so, please raise your right hand." The transcript then reveals "that all 12 jurors ... raised their right hand affirming that those are indeed their unanimous verdicts."
 

 Accordingly, upon consideration of the
 
 Lawrence
 
 factors, we conclude that there is no indication in the present case that the jury's verdicts were not unanimous.
 

 *578
 
 Moreover, the instant case is not one in which the risk of a non-unanimous verdict would have arisen by virtue of the trial court's instructions. Defendant argues that the jury instructions "contained no information for the jurors to decide how they were to proceed when the evidence could support various verdicts or could support a number of the verdicts." For example, Defendant notes that Q.B. testified that Defendant vaginally penetrated her in the "kids' living room" "[m]ore than one time[,]" but only detailed one particular incident in that location. Thus, Defendant argues that "one juror could have found that the detailed description met all of the elements for first degree statutory rape and then used Q.B.'s testimony that it happened more than one time to use the evidence of the other times for a guilty verdict
 
 *900
 
 on indecent liberties." Yet, "based on the same evidence another juror could have reasoned that the detailed description of the one incident supported a guilty verdict on indecent liberties [and] first degree statutory rape." Defendant maintains that "[t]his confusion would have been allayed if the court had instructed the jurors that they needed to be unanimous either on evidence supporting an individual offense or supporting numerous offenses."
 

 The crimes with which Defendant was charged, however, do "not list, as elements of the offense, discrete criminal activities in the disjunctive."
 
 Id.
 
 at 375,
 
 627 S.E.2d at 613
 
 (quotation marks omitted) (citing
 
 State v. Hartness
 
 ,
 
 326 N.C. 561
 
 , 564,
 
 391 S.E.2d 177
 
 , 179 (1990) ). Instead, "the indecent liberties statute simply forbids 'any immoral, improper, or indecent liberties' " with any child under 13 years of age where such act is taken for the purpose of arousing or gratifying sexual desire.
 
 Id.
 
 at 374,
 
 627 S.E.2d at 612
 
 (quoting
 
 N.C. Gen. Stat. § 14-202.1
 
 (a)(1) ). The particular act found to have been performed is immaterial to the unanimity inquiry "because the evil the legislature sought to prevent was the taking of any kind of sexual liberties with a child in order to arouse or gratify sexual desire."
 
 State v. Lyons
 
 ,
 
 330 N.C. 298
 
 , 306,
 
 412 S.E.2d 308
 
 , 314 (1991). Thus, "even if some jurors [were to find] that [a] defendant engaged in one kind of sexual misconduct, while others found that he engaged in another, the jury as a whole would [still have] unanimously f[ou]nd that there occurred sexual conduct within the ambit of any immoral, improper, or indecent liberties."
 
 Lawrence
 
 ,
 
 360 N.C. at 374
 
 ,
 
 627 S.E.2d at 612
 
 (internal quotation marks omitted).
 

 Here, the trial court instructed the jury that Defendant had been charged with nine counts of taking indecent liberties with a child, five of which involved conduct against Q.B. The trial court properly instructed that what constitutes "[a]n indecent liberty is an immoral, improper or
 
 *579
 
 indecent touching or act by the Defendant upon the child." Pursuant to those instructions, the jury found Defendant guilty of all five counts of taking indecent liberties with Q.B. Indeed, Q.B. testified to at least five particular incidents that would have constituted indecent liberties as reflected in the verdict sheets: (1) touching and digital penetration of Q.B.'s vagina in the master bedroom; (2) penile penetration of Q.B.'s vagina using Blue Magic hair grease in the master bedroom; (3) penile penetration of Q.B.'s vagina using strawberry hair grease in the master bedroom; (4) penile penetration of Q.B.'s vagina in the master bedroom after Q.B. showered; (5) penile penetration of Q.B.'s vagina in the "kids' living room"; (6) penile penetration of Q.B.'s vagina in the "adult living room"; and (7) penile penetration of Q.B.'s vagina in Defendant's son's bedroom. It is irrelevant that Q.B. testified about some incidents having happened "more than one time" in a particular location. Quite simply, "while one juror might have found some incidents of misconduct and another juror might have found different incidents of misconduct, the jury as a whole found that improper sexual conduct occurred."
 
 Id
 
 . at 374,
 
 627 S.E.2d at 612-13
 
 .
 

 Similarly, the jury convicted Defendant of four counts of first-degree statutory rape of a child, and Q.B. testified to at least four specific incidents that constituted statutory rape and occurred in each of the four locations indicated on the verdict sheets. The record therefore reveals no danger that the four first-degree statutory rape verdicts were not unanimous.
 
 See
 

 id.
 
 at 376,
 
 627 S.E.2d at 613
 
 ("[D]efendant was indicted on five counts of statutory rape; Lucy testified [that she had sexual intercourse with the defendant thirty-two separate times, but testified] to five specific incidents of statutory rape, and five verdicts of guilty were returned to the charge of statutory rape. We conclude that defendant was unanimously convicted by the jury.");
 
 see also
 

 State v. Wiggins
 
 ,
 
 161 N.C. App. 583
 
 , 593,
 
 589 S.E.2d 402
 
 , 409 (2003) ("As to the [five] charges of statutory rape, R.B. testified to four specific occasions she could describe in detail during which defendant had sexual intercourse with her .... R.B. also testified that defendant had sexual intercourse with her five or more times a week during this ... period. Thus, where [five statutory rape] offenses ... were charged in the indictments, and based on the
 
 *901
 
 evidence presented at trial, the jury returned [five] guilty verdicts, there was no danger of a lack of unanimity between the jurors with respect to the verdict."),
 
 disc. review denied
 
 ,
 
 358 N.C. 241
 
 ,
 
 594 S.E.2d 34
 
 (2004).
 

 Thus, not only does an examination of the
 
 Lawrence
 
 factors indicate that the jury's verdicts were unanimous, but the instant case is also not one in which the risk of a non-unanimous jury verdict would arise
 
 *580
 
 by virtue of the trial court's instructions. Accordingly, we conclude that Defendant was unanimously convicted of the counts for which the trial court imposed judgment.
 

 Defendant's Reconsideration of His Decision Not to Testify
 

 Lastly, Defendant argues that the trial court violated his "right to testify by denying [his] request to testify after the State and [he] had rested and by failing to ask [him] if he agreed with his attorney's decision not to make a proffer of this testimony[.]" We find no such error.
 

 It is axiomatic that "[t]he right of a defendant ... to present to the jury his version of the facts is a fundamental element of due process of law, guaranteed by the Sixth and Fourteenth Amendments to the federal Constitution and by Article I, Sections 19 and 23 of the North Carolina Constitution."
 
 State v. Miller
 
 ,
 
 344 N.C. 658
 
 , 673,
 
 477 S.E.2d 915
 
 , 924 (1996). Also well established, however, is that "there is no constitutional right to have a case reopened."
 
 State v. Perkins
 
 ,
 
 57 N.C. App. 516
 
 , 520,
 
 291 S.E.2d 865
 
 , 868 (1982). Where a defendant expresses a desire to testify after having already waived his right to do so, the decision whether to reopen the case and hear the defendant's testimony is within the sound discretion of the trial judge.
 
 See
 
 id.
 

 ;
 
 see also
 
 N.C. Gen. Stat. § 15A-1226(b) (2017). Thus, a trial court's decision whether to reopen a case when a defendant reconsiders his decision not to testify will be upheld "unless it is shown to be manifestly unsupported by reason."
 
 State v. Phillips
 
 ,
 
 171 N.C. App. 622
 
 , 630,
 
 615 S.E.2d 382
 
 , 387 (quotation marks omitted),
 
 appeal dismissed and disc. review denied
 
 ,
 
 360 N.C. 74
 
 ,
 
 622 S.E.2d 628
 
 (2005).
 

 In the instant case, toward the end of the State's evidence, the trial court suggested to Defendant that he begin thinking about whether he wanted to testify. At the end of the next day, Defendant informed the trial court that he would "decide tonight." Finally, after the close of the State's evidence on the next day, the trial court addressed Defendant regarding his decision whether or not to testify:
 

 Sir, you have the right to remain silent, any statement you make may be used against you. You don't have to say anything to me at all, you're represented by a lawyer, but I'd like to have this discussion with you to make sure you understand your rights concerning whether or not you wish to testify. You have the right to testify or not to testify. The decision about whether or not to testify should not be made by your lawyer, the district attorney, me, your family
 
 *581
 
 members or anyone else. That decision is yours and yours alone. If you choose not to testify, I will give an instruction to the jury saying they are not to hold that against you. If you don't mind discussing this with me, I want to ask you do you have any questions about your right to testify or not to testify or anything related to that right?
 

 Defendant told the trial court that he did not have any questions on the matter, but said that he wanted to speak with his attorney one last time before he made his decision. After speaking privately with his attorney for fifteen minutes, Defendant informed the trial court that he was not going to testify. Defendant thereafter did not present any evidence, the defense rested, and the jury was excused.
 

 However, after the charge conference, Defendant's attorney informed the trial court that Defendant had reconsidered his decision and now wished to testify. The trial court declined to reopen the case and bring the jury back in order to allow Defendant to testify, reasoning:
 

 I don't know how I could have been more careful than to go through with him throughout the week and talk to him about his right to testify or not to testify. I did it at the very beginning, I don't know that I did it every day but I believe I did it
 
 *902
 
 multiple days. I gave him-talked to him last night about it, explained it to him again last night, he said he wanted to have an opportunity to think about it, I said fair enough, gave him the opportunity to do that. Asked him this morning, again he delayed. Then he wanted an opportunity to consult with his attorney when the-I sent the jury out. I asked-after a while I asked the bailiff to go and ask that you all come back in so I can discuss it. I was informed that he needed additional time, I gave him additional time to do that. And he came back in I went through it in detail with him, he indicated he did not want to testify. Then the matter was-the case was rested in front of the jury, I then heard motions. ... And to the extent I have discretion, I'm going to deny his request at this stage.
 

 The trial court thoroughly explained its reasoning, and we see nothing in its justification to be manifestly unsupported by reason. Accordingly, the trial court did not abuse its discretion when it declined to reopen the case after Defendant reconsidered his decision not to testify.
 

 *582
 

 Conclusion
 

 For the reasoning contained herein, we conclude that (1) the trial court properly denied Defendant's motion to dismiss the charge of disseminating obscenity to a minor; (2) the trial court's instructions did not deprive Defendant of his right to unanimous jury verdicts; and (3) the trial court did not abuse its discretion when it declined to reopen the case after Defendant reconsidered his decision not to testify.
 

 NO ERROR.
 

 Judges BRYANT and DILLON concur.
 

 [1]
 

 Pseudonyms are used throughout the opinion to protect the identities of the minor victims and for ease of reading.
 

 [2]
 

 Defendant was initially charged with eleven counts of taking indecent liberties with a child, but the State voluntarily dismissed two of those charges that involved Q.R.
 

 [3]
 

 In his brief, Defendant states that his "convictions for sex activity with a minor over whom the defendant had assumed the position of a parent," rather than his convictions for taking indecent liberties with a child, should be vacated. However, this appears to be a typo, as the trial court arrested judgment on those four counts.